```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                         SOUTHERN DIVISION
     _____
 3                                  )
     UNITED STATES OF AMERICA       )
 4         v.                       )   Case No. 8:23-cr-00145-DLB-1
     ISIDORE I. IWUAGWU,            )
 5              Defendant.          )
     _____)
 6
                                        Greenbelt, Maryland
 7                                      September 21, 2023
                                        3:12 p.m.
 8

 9                      DETENTION REVIEW HEARING
              BEFORE THE HONORABLE DEBORAH L. BOARDMAN
10

11                      A P P E A R A N C E S

12   ON BEHALF OF THE GOVERNMENT:

13       UNITED STATES ATTORNEY'S OFFICE
         6406 Ivy Lane, Suite 800
14       Greenbelt, Maryland  20770
         BY:  KELLY O'CONNELL HAYES, ASSISTANT U.S. ATTORNEY
15            (301) 344-0041
              kelly.hayes@usdoj.gov
16
     ON BEHALF OF THE DEFENDANT:
17
         BRENNAN McKENNA & LAWLOR, CHTD.
18       6305 Ivy Lane, Suite 700
         Greenbelt, Maryland  20770
19       BY:  JOHN MICHAEL McKENNA, ESQUIRE
              (301) 474-0044
20            jmckenna@bsm-legal.com

21   ALSO PRESENT:  SPECIAL AGENT GREGORY STEPHENS - DOJ-OIG
                    USPO ERIK FINNEYFROCK
22


23
                         PATRICIA KLEPP, RMR
24                       Official Court Reporter
                     6500 Cherrywood Lane, Suite 200
25                     Greenbelt, Maryland  20770
```

```
 1                       P R O C E E D I N G S
 2           (Call to order of the Court.)
 3              THE COURTROOM DEPUTY:  All rise.  This Honorable Court
 4   resumes in session, the Honorable Deborah L. Boardman presiding.
 5              THE COURT:  Okay.  Good afternoon, everyone.
 6           Would the government call the case.
 7              MS. HAYES:  Good afternoon, Your Honor.  Calling the
 8   case of United States of America v. Isidore Iwuagwu, Criminal
 9   No. DLB-23-145.  The case is called for a hearing on a motion to
10   reconsider an order of detention.  I'm Kelly Hayes on behalf of
11   the United States.  I am joined at counsel table by Special
12   Agent Gregory Stephens with the Department of Justice's Office
13   of Inspector General.
14              THE COURT:  Okay.  Good afternoon.
15              MS. HAYES:  Good afternoon, Your Honor.
16              MR. McKENNA:  Good afternoon, Your Honor.
17   John McKenna on behalf of Mr. Iwuagwu, who is present.
18              THE COURT:  Okay.  Good afternoon to all of you.  Good
19   afternoon, Mr. Finneyfrock.
20           Please be seated.
21           Okay.  We're here on the defendant's motion to
22   reconsider the detention order that was entered last August by
23   Judge Sullivan.  I have reviewed the motion, which is at ECF 37;
24   the government's response, ECF 39; and the government's
25   exhibits.  I've also, of course, reviewed the detention order
```

1 | and the presentence report, and I recall the guilty plea and
2 | have refreshed my memory of that.
3 |     So Mr. McKenna.
4 |     MR. McKENNA:  Thank you, Your Honor.
5 |     Before we get started, can we approach very quickly
6 | and very briefly?
7 |     THE COURT:  You may.
8 |     MR. McKENNA:  Thank you.
9 |   (Discussion at sidebar.)
10 |   (The following portion is sealed by order of the Court and
11 | is contained in a sealed transcript.)
12 |   (Open court.)
13 |     THE COURT:  Okay.  We'll have a sealed portion of the
14 | proceeding, please.
15 |     THE COURTROOM DEPUTY:  If you could wait outside for
16 | just a little bit.
17 |     MS. HAYES:  And your Honor, if I may, unrelated to
18 | what we are about to discuss, I also note, Your Honor, that
19 | earlier this morning, Pretrial Services did e-mail I believe
20 | your -- the Court as well as both parties the original Pretrial
21 | Services report as well an addendum to the Pretrial Services
22 | report, and I wanted to ensure Your Honor received those.
23 |     THE COURT:  Yes.  Thank you very much, Ms. Hayes; I
24 | appreciate that.  I have received that, and I have reviewed both
25 | the presentence -- excuse me, the Pretrial Services report and

1  the addendum.
2      MS. HAYES:  Thank you, Your Honor.
3      THE COURT:  All right, very good.
4      Mr. McKenna, you received both of those documents?
5      MR. McKENNA:  Yes, Your Honor.
6    (The following portion is sealed by order of the Court and
7  is contained in a sealed transcript.)
8    (Open court.)
9      MR. McKENNA:  Your Honor, if I could --
10     THE COURT:  Yes, Mr. McKenna.
11     MR. McKENNA:  Thank you, Your Honor.
12     Your Honor, in support of our motion in this case, you
13 have our pleading -- I'm not going to be very long -- you have
14 the government's response.  Government's response, they don't
15 allege and certainly there's no evidence that he's a danger.  So
16 I'm going to address really the issue, which is whether he's a
17 flight risk.  And I can't -- he is a dual citizen; I'm not going
18 to try to hide that fact.  He has ties to Nigeria but not
19 immediate family.  His passports I have in my office, so I can
20 certainly make them available to the Court.
21     I would tell the Court, he is not a flight risk.  He
22 has two kids in Prince George's County schools.  He owns a home
23 in Prince George's County.
24     THE COURT:  How old are his children?
25     THE DEFENDANT:  Five and seven years old.

1    MR. McKENNA: All of his immediate family live in the
2 United States. He does have some cousins that are still living
3 in Nigeria.
4    His family has indicated they're willing to do
5 anything they can, including putting liens on their properties,
6 the houses they own, to ensure his presence. There are options
7 here. The Court can put a GPS locating device on him. It
8 happens all the --
9    THE COURT: What property? I thought that his father
10 was in an apartment. Am I -- what -- I see. No, there's a
11 townhouse. Okay, all right.
12    MR. McKENNA: He has family members here, brothers and
13 sisters, his parents, who are willing to put up properties if
14 the Court deems that a necessary item in this case.
15    He's got obviously no prior record. He had a good
16 employment history, no history of substance abuse, although
17 I think there was some alcohol use.
18    In this case, Your Honor, there certainly are options.
19 So I mean, you have somebody who has a lot of contacts with the
20 United States, with Maryland, with this district. He has kids
21 that he's not going to -- he's not going to flee from.
22    So I would ask the Court to set conditions of release,
23 because I think there are a number of reasons and no real good
24 ones not to. And I understand that he does he have contacts
25 with Nigeria, but your Honor, his stronger contacts and the ones

1	that really matter are the ones here in this district.  He's got
2	a lot of reasons to do everything in his power to stay in
3	compliance, and I know if the Court does set conditions of
4	release, whatever they are, however onerous they are, he will
5	abide by them.
6	            THE COURT:  Can you address the operative statute,
7	which is Title 18 of the United States Code Section 3143(a)(1),
8	which says I must order a person awaiting sentencing detained
9	unless I find, by clear and convincing evidence, that he is not
10	likely to flee.  So the clear and convincing evidence you've
11	proffered, do you agree it's your burden at this point?
12	            MR. McKENNA:  Sadly, I do, yes, it is my burden.  And
13	Your Honor, I would hope that we are showing clear and
14	convincing evidence by virtue of his complete lack of record,
15	his contacts here with the community, the fact that his kids are
16	in school here in Prince George's County.
17	            You know, his guidelines right now are 57 to
18	71 months.  We're not talking about 20 years in jail as being,
19	you know, the specter of what to run from.  He's been
20	incarcerated now for a year, a year and a month.  So I think the
21	idea that he would now choose to flee I find bordering on
22	absurd.
23	            And I understand it's our burden, and I accept that.
24	You know, I think -- I think the Court has so many options that
25	pretrial has to ensure his presence that I -- you know, I'd ask

1 the Court to be creative with whatever the Court believes
2 necessary and appropriate to ensure his presence, because he's
3 going to -- he's going to adhere to anything the Court says.
4             And again, he's got an extended family here in
5 Maryland who are willing to put up properties, if that's what
6 the Court wants, and that's how sure they are that he'll show
7 up.
8             THE COURT:  You've said "properties," in the plural.
9             MR. McKENNA:  Yes.
10            THE COURT:  I'm only aware of this townhouse, whose
11 value is identified at as $308,000.
12            MR. McKENNA:  Your Honor, his brother, who can also
13 address the Court, if the Court would like, is also willing put
14 up his property.
15            THE COURT:  Have you identified how much equity is in
16 these properties?
17            MR. McKENNA:  Your Honor, sadly, no, I have not.
18            THE COURT:  Okay.
19            MR. McKENNA:  But they're willing to put -- whatever
20 equity there is in the property, they're willing to put
21 temporary liens on those properties as assurance that he will
22 show up.
23            THE COURT:  Okay.  Thank you very much, Mr. McKenna.
24            MR. McKENNA:  Certainly.
25            THE COURT:  Ms. Hayes.

1          MS. HAYES:  Thank you, Your Honor.
2          I won't belabor Ms. Mao's submission in response to
3   the motion.  Your Honor has already aptly noted that the burden
4   is on the defendant, and moreover, the statute specifically says
5   that Your Honor shall detain the defendant unless he can carry
6   his burden of showing, by clear and convincing evidence, that
7   he's not likely to flee.
8          Your Honor, the defendant's ties to Nigeria are
9   extensive, including the crime that he perpetrated here, which
10  involved sending significant amounts of money over to Nigeria,
11  as well as Nigerian coconspirators who still remain in Nigeria.
12  And certainly, they are willing to assist -- or I submit would
13  be willing to assist, given that they're still over in Nigeria.
14         Your Honor, between November of 2013 and July of 2021,
15  the defendant was involved in transactions of nearly
16  $3.5 million.
17         THE COURT:  Hold on.  You said 2013; is that right?
18         MS. HAYES:  I -- yes, Your Honor.
19         THE COURT:  The plea agreement --
20         MS. HAYES:  I would have to double-check on the
21  statement of facts.
22         THE COURT:  I thought the plea agreement said 2015.
23  I'm not sure it's material, but I --
24         MS. HAYES:  Your Honor, I will defer to the
25  plea agreement.  I am reading from Mr. Mao's response, so I

```
 1   don't have any additional information.
 2              THE COURT:  Okay, all right.
 3              MS. HAYES:  I do believe it was 2015, Your Honor.
 4              Special Agent, I apologize for that error.
 5              So $3.5 million, the defendant either withdrew funds
 6   or wired fraud proceeds to foreign banks and companies,
 7   including foreign banks and companies in Nigeria.  He also -- as
 8   I mentioned, you know, there were coconspirators that he worked
 9   with who are still in Nigeria.  He's a Nigerian citizen.
10              He also -- I know that there was -- I believe that
11   there was some disagreement that -- related to whether or not
12   the defendant owns a home.  However, the defendant's ex-wife did
13   say to our law enforcement officer that he owned a home in
14   Nigeria.  He has multiple bank accounts overseas in Nigeria,
15   including ones that were used to perpetrate the scheme.
16              According to the presentence report, Your Honor, he
17   also has a foundation in Nigeria since 2019 that he has been
18   running.
19              So his ties to Nigeria just cannot be understated.
20              Your Honor, he's also traveled and stayed in Nigeria
21   for extensive periods of time, not just weeks at a time.
22   For example, in December of 2021 through April of 2022, he
23   stayed in Nigeria for four months, our travel records show,
24   although did he lie to Customs officers and say that he was only
25   there for three weeks.  That's just one of many untruths that
```

1  Mr. Iwuagwu had stated to Customs officials.
2          Your Honor, he also previously -- and I understand and
3  I fully recognize that this is dated history, so I -- and Your
4  Honor will put whatever credence to it it so wishes, but it does
5  bear mentioning that in November of 2022 [sic], during a traffic
6  stop, officers recovered a Maryland identification from the
7  defendant with other --
8          THE COURT:  November of 2012, right?
9          MS. HAYES:  2012, November of 2012, yes, Your Honor.
10 Excuse me; what did I say?
11         THE COURT:  I thought I heard 20- -- in any event,
12 2012.
13         MS. HAYES:  It is 2012.  I apologize again if I
14 misspoke.
15         There were United States permanent residence cards
16 bearing names of other individuals with pictures of the
17 defendant.  There were two United States Social Security cards
18 bearing names of other individuals but with -- that the
19 defendant had admitted were fraudulent.
20         Your Honor, following that -- so not only is it of --
21 certainly a concern that at least in 2012, Mr. Iwuagwu had the
22 ability to access false identification documents or legitimate
23 identification documents bearing his photo with the -- with
24 names of others, but then, following that traffic stop in
25 December -- so November of 2012 was the traffic stop.  In

1  December of 2012, the defendant flew from the United States to
2  Nigeria and stayed abroad for six months.
3         And so Your Honor, if that shows -- and again, I
4  recognize that that was over ten years ago, but Mr. Iwuagwu's,
5  you know, MO suggests that, you know, when he gets in trouble,
6  he flees to Nigeria and has those ties.  And I think that's more
7  what shows -- the extensive periods of time that he's spent in
8  Nigeria -- you know, I understand he has children here, but he
9  also -- he didn't come to this country until he was
10 approximately 16 years old.  He was educated in Nigeria.  He had
11 homes.  He had a good home, he had clean water, he had --
12        THE COURT:  Well, I'm not sure about that.  I read the
13 PSR; that's contrary to that.  But I'm not sure that's material,
14 but --
15        MS. HAYES:  Well, Your Honor, I guess my brief review
16 of it was that at some point, his father moved to the
17 United States where there was, but that he was there, and he did
18 have a childhood in Nigeria and now has spent significant
19 periods of time in Nigeria.  So to suggest that he wouldn't be
20 in a position where he could flee and even bring his children
21 with him is certainly I think questionable in terms of whether
22 or not that would be something that would prohibit him, given
23 that he is facing such an extensive period of time.
24        As the PSR indicates and -- which is -- coincides with
25 his plea agreement, he is looking at a guidelines range of 57 to

1    71 months.  He has only been detained for one year, 12 months of
2    that.
3            So Your Honor, we believe, under all of the -- all of
4    the factors under the Bail Reform Act, including the fact that
5    it is, in fact, the burden of the defendant to prove, by clear
6    and convincing evidence, that he does not need to be detained,
7    we believe that he should remain detained pending sentencing.
8            THE COURT:  Thank you, Ms. Hayes.
9            Mr. McKenna, anything else?
10           MR. McKENNA:  Just a couple -- couple words in
11   response.
12           Your Honor, my client does not own a home in Nigeria.
13   He does own a couple of plots, all of which equal less than an
14   acre of land.  There's no structures on the property.
15           The 2012 event was a misdemeanor which was dismissed.
16   He wasn't fleeing from anything.
17           You know, I run the risk always of standing up and
18   being redundant.  Your Honor, for a whole lot of reasons, I
19   believe he is not a flight risk.  I would ask the Court to find
20   that we did meet our burden of clear convincing evidence.  He's
21   made his home here.  He has no fond memories of his times in
22   Nigeria, does not wish to ever make a life there.  He is a
23   United States citizen.  His kids are here in the county.  He
24   wants to be with his kids.  I'd ask the Court to set conditions
25   of release.  Whatever they are, however onerous they are, he'll

1  abide by those conditions, Your Honor.

2          THE COURT: Thank, you Mr. McKenna.

3          Just give me one moment, please.

4      (Pause)

5          THE COURT: Okay. Pending before me is Mr. Iwuagwu's
6  motion for reconsideration of the detention order that
7  Magistrate Judge Sullivan issued on August 10th of last year.

8          Mr. Iwuagwu has pled guilty to conspiracy to commit
9  money laundering, in violation of Title 18 of the United States
10 Code Section 1956(h). Because he has pled guilty, the operative
11 statute is Section 3143(a)(1). And under that, I must order him
12 detained awaiting sentencing unless I find, by clear and
13 convincing evidence, that he is not likely to flee. I need not
14 discuss "pose risk of danger to the safety of others or the
15 community," as the government is not moving under danger.

16         Mr. Iwuagwu bears the burden of proof at this point.

17         The Bail Reform Act requires that the Court consider
18 the following factors to determine whether there are release
19 conditions that will reasonably assure the appearance of
20 Mr. Iwuagwu: The nature and circumstance of the offense
21 charged, the weight of the evidence, the history and
22 characteristics of Mr. Iwuagwu, including his character,
23 physical and mental condition, family ties, employment,
24 financial resources, length of residence in the community,
25 community ties, past conduct, history relating to drug or

1  alcohol abuse, criminal history, and his record concerning
2  appearances in court.
3           I also have to consider whether, at the time of the
4  current offense, he was on probation, parole, or other release
5  pending trial, sentencing, or appeal.  And of course, I have to
6  consider the nature and seriousness of the danger to any person
7  or the community that would be posed by his release.
8           All of that's from Title 18 of the United States Code,
9  Section 3142(g).
10          Mr. Iwuagwu has no criminal history, and he was not on
11 any sort of court supervision, whether it's pretrial or
12 probation, when he committed this crime.  So that factor cuts in
13 his favor for sure.
14          However, now that he's pled guilty, we are certain
15 what he did.  In a seven-page statement of facts that's attached
16 to the plea agreement, Mr. Iwuagwu has agreed to participating
17 in a romance fraud scheme that was far-reaching, long-running,
18 and intricate.  It spanned no less than six years, possibly
19 longer.  People in Nigeria intentionally preyed upon and sought
20 out vulnerable elderly women in the United States who were
21 looking for love and companionship, in order to take their
22 money.  At least ten victims were involved in this case, perhaps
23 more.
24          Mr. Iwuagwu was called a picker, which means he
25 received the money from the fraud victims and transferred the

1  money to the fraudsters in Nigeria.  He lied to at least one
2  victim when the victim demanded her money back.
3          All told, he and his conspirators -- coconspirators
4  scammed the victim out of millions of dollars -- victims out of
5  millions of dollars, and he is responsible for laundering
6  $1.4 million.
7          Mr. Iwuagwu committed this crime while he was employed
8  as a Special Deputy United States Marshal, a sworn law
9  enforcement officer.
10         His fraud did not end there.  He defrauded the
11 government during the pandemic.  He lied to obtain unemployment
12 benefits from the State of California.  He said he was
13 unemployed.  He was not.  He was being paid as a U.S. Marshal.
14 He said he was a California resident, living in Santa Maria,
15 California.  He was not.  He was a resident of Maryland, living
16 in Upper Marlboro.
17         The government has offered credible evidence that
18 Mr. Iwuagwu lied to the United States Customs when he -- and
19 reentered the United States, telling the agent that he had --
20 was gone for only three weeks, when in fact, he had been gone
21 for four months.  He was traveling with an unusual amount of
22 personal documents, a birth certificate, a divorce certificate,
23 diplomas and letters from United States banks, and he
24 highlighted with the Customs agents his status as a
25 U.S. Marshal, which he also did with one of the victims who

1    expressed doubt about sending money.

2           He also lied to banks when they called to ask about
3    questionable wire transfers in large sums, fabricating false
4    stories about where the money was going.

5           In addition, Mr. Iwuagwu has been arrested and charged
6    for possession of counterfeit documents unrelated to this case.
7    That was in 2012.  That is quite dated.  I don't put much weight
8    on that, but it's something I can't ignore.  And the fact that
9    after that arrest and his release from custody, he went to
10   Nigeria for six months is also something I cannot ignore.

11          I also note that in the presentence report, he
12   reported he was married twice, both times to women in the
13   United States, but could not remember his first wife's name,
14   first name.  His brother reported, as I read it, that he was
15   only married one time.

16          Mr. Iwuagwu has extensive ties to Nigeria.  He was
17   born there.  His coconspirators appear to still be there.  He
18   has traveled there in the recent past.  Some family lives there.
19   Admittedly, the bulk of his family lives here, including his two
20   parents who are here, and his brother, and perhaps most
21   importantly, his two school-aged children.  And I understand,
22   through his lawyer, that he would surrender his U.S. and
23   Nigerian passports, but I am not convinced those facts would
24   deter him from fleeing to Nigeria if he were released pending
25   sentencing.

1        Mr. Iwuagwu has demonstrated a mastery at committing
2   fraud, except for the fact that he was caught, but his knowledge
3   of ways to commit fraud would allow him, in my view, to find a
4   way, even if unlawfully, to leave the United States and enter
5   Nigeria.
6        The only change in circumstances since the detention
7   order a year ago August is that he has pled guilty early and has
8   significantly accepted responsibility.  The guilty plea actually
9   makes it more difficult for him to be released, because under
10  the statute, the presumption is detention.
11       Release, ultimately, is about trust.  And I do trust
12  that his family would care for him, that his family would report
13  if he did anything wrong, and I'm looking at them and telling
14  them that.  This is not about my distrust in the family; this is
15  about a track record of lying to the police, to victims, to
16  Customs agents, and I do not have trust that Mr. Iwuagwu would
17  abide by my conditions of release.
18       I do not find, by clear and convincing evidence, that
19  he is not likely to flee if released.  His motion to reconsider
20  the detention order is denied.
21       MR. McKENNA:  Thank you, Your Honor.
22       THE COURT:  Thank you very much.
23       THE COURTROOM DEPUTY:  All rise.  This Honorable Court
24  stands adjourned.
25       (The proceedings were adjourned at 3:46 p.m.)


```
 1                 CERTIFICATE OF OFFICIAL REPORTER

 2       I, Patricia Klepp, Registered Merit Reporter, in and for

 3   the United States District Court for the District of Maryland,

 4   do hereby certify, pursuant to 28 U.S.C. § 753, that the

 5   foregoing is a true and correct transcript of the

 6   stenographically-reported proceedings held in the above-entitled

 7   matter and the transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9                           Dated this 8th day of January, 2024.

10

11
                         _____/s/_____
12                       PATRICIA KLEPP, RMR
                         Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```